**SUDOUEST IMPORT SALES CORPORATION, Plaintiff,**

v.

**UNION CARBIDE CORPORATION, Defendant.**

**Civ. No. 82–2483(PG).**

United States District Court, D. Puerto Rico.

Sept. 8, 1983.

Harry A. Ezratty, Philip E. Roberts, San Juan, P.R., for plaintiff.

Maggie Correa-Avilés, McConnell, Valdés, Kelley, Sifre Griggs & Ruizsuria, San Juan, P.R., for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Plaintiff, Sudouest Import Sales Corporation ("Sudouest"), filed an action on October 14, 1982, against Union Carbide Corporation ("Union Carbide") alleging that the latter terminated without just cause a contract entered between the mentioned parties allegedly for the distribution of defendant's Material Systems Division's products in the Commonwealth of Puerto Rico. Plaintiff alleged that said termination violated plaintiff's rights as provided by Act No. 75 of June 25, 1964, as amended, 10 L.P.R.A. 278, et seq. ("the Act"). Plaintiff's second and third causes of action allege the violation of the contract agreement due to the termination and the damages and losses thereby caused.

Plaintiff requested an injunction pendente lite pursuant to Article 3A of the Act, 10 L.P.R.A. 278b–1. Defendant's objection to the same was predicated on the grounds that plaintiff was not a "dealer" protected by the Act; that its issuance would be contrary to the purposes of the Act and the public policy behind it; and in the alternative, that there is a great probability of defendant's success on the merits having existed just cause for the termination. Lastly, defendant opposed by arguing that plaintiff is not protected by the Act, the other two alleged causes of action are without validity since the agreement between the parties provided for termination on written notice.

An evidentiary hearing was held on January 26, 1983, to determine if the relationship between the parties was protected by the Act. Plaintiff offered the testimony of its President, Mr. Charles Hinojosa, and several pieces of documentary evidence. Defendant cross-examined plaintiff's witness and offered documentary evidence. This Court, after considering all the evidence offered, denied the request for an injunction pendente lite and expressed that it did not think plaintiff qualified as dealer under the Act with the evidence it had heard.

Defendant filed a request for summary judgment on June 25, 1983, alleging that plaintiff was not a "dealer" protected by the Act. In support of the verified request defendant submitted the transcript of the testimony of plaintiff's President as delivered during the January 26th hearing; an affidavit of Mr. Thomas Roper, who is a former employee of Union Carbide Corporation, having worked there from 1965 to 1983, the last fifteen years as marketing manager; the Sales Representative Agreement between the parties dated May 9, 1978; and several national contracts executed between Union Carbide and different companies in the United States. Plaintiff filed an opposition on July 15, 1983, supported by Mr. Hinojosa's affidavit, the Sales Representative Agreement of May 9, 1978; and several documents and correspondence.

After reviewing the documents offered by both parties, the sworn statements, the transcript of the hearing, the answers to the interrogatories, and the allegations, we have determined that the following material facts are not genuinely in issue:

1. Sudouest and Union Carbide executed a Sales Representative Agreement dated May 9, 1978.

2. Union Carbide granted Sudouest as Representative, as per the first paragraph of the Sales Representative Agreement, the right to solicit orders for the sale by Union Carbide of its products (Kemet).

3. Sudouest was notified on July 26, 1982, by Union Carbide that the Sales Representative Agreement was being terminated effective September 1, 1982.

4. Paragraph 11 of the Sales Representative Agreement provides for termination by either party on a thirty-day written notice specifying the effective date of termination.

5. Sudouest had no obligation to purchase defendant's products (Kemet) and did not purchase defendant's products.

6. Sudouest did not carry an inventory of defendant's products.

7. Sudouest did not warehouse defendant's products.

8. Sudouest did not approve the sales of defendant's products, nor approved the orders for defendant's products.

9. Purchase orders of defendant's products had to be sent to Union Carbide for approval and delivery. Sudouest had no voice in the approval or rejection of said purchase orders by Union Carbide.

10. Sudouest did not determine the prices of defendant's products.

11. Sudouest did not invoice the customers on sales of defendant's products.

12. Sudouest did not deliver defendant's products to the purchaser.

13. Sudouest did not assume the risk of credit sales made to Union Carbide's clients visited by it.

14. Sudouest did not engage in collection efforts in relation to defendant's products and merely assisted Union Carbide in the collection of some outstanding bills when called upon by the latter.

15. Sudouest did not execute or close sales contracts for defendant's products.

16. Union Carbide entered into and formalized the sales contracts for its products through its officers, none of which was plaintiff.

17. Sudouest's main function was to fill in purchase orders and transmit them to Union Carbide's offices for their approval. The delivery and invoice was made directly to the purchaser by Union Carbide.

18. The purchase orders were provided by the customers themselves.

19. Union Carbide executed contracts with different corporations in the United States for the sale by Union Carbide of its products to those corporations and to their affiliates or subsidiaries in Puerto Rico.

20. Those contracts were negotiated and executed by Union Carbide's officials in the continental United States.

21. Sudouest did not participate in the negotiations nor actual execution of the contracts. Mr. Hinojosa was merely a bystander in some of these.

22. The type of the Kemet products that could be bought by the different corporations and its subsidiaries or affiliates was already specified in the contracts, as well as the maximum prices of the specified products. The contracts also established the maximum amount they could buy at the agreed prices.

23. Even though the parties to the contracts had no obligation to buy the Union Carbide products pursuant to the national contracts, the material fact is that the products and the sales were promoted by Union Carbide's officials when negotiating the national contracts, and the future sale by Union Carbide of its products was made possible because of the execution of the referred contracts.

24. Without the previous agreements between Union Carbide and the parent companies in the continental United States,

the purchase by the subsidiaries or affiliates in Puerto Rico could not have been possible.

25. Sudouest's President, Mr. Hinojosa, and the two salesmen working for Sudouest visited regularly the different customers in the Island. The visits were done in relation to all the products Sudouest was representing and not particularly or exclusively for Union Carbide's products.

26. When in the course of their visits the defendant's product was needed, employees of plaintiff or its representative would fill in the purchase orders in the order provided by the clients themselves and according to the specifications given by the client.

27. The purchase orders were sent for approval to Union Carbide, who sent the merchandise directly to the customer in Puerto Rico, invoiced the customer, assumed the risk of credit, and collected directly from the client.

28. Union Carbide had to approve the purchase orders and closed all the sales contracts for the products in Puerto Rico.

29. Defective merchandise, if any, was sent back to Union Carbide for replacement.

30. Sudouest only had to intervene once in the repairment of a product.

31. The defendant's products (Kemet) are the finest products available in Puerto Rico.

32. Kemet was Sudouest's finest line.

33. Sudouest published periodic newsletters where defendant's product was mentioned together with the other products Sudouest represented. Sudouest also had paper coasters where it listed all the various product lines it handled in Puerto Rico, including defendant's.

34. Sudouest participated in two trade shows, and Union Carbide's product was one of the products included in the booth showing a banner of the product which was made available by Union Carbide.

35. Sudouest had several catalogs of the Kemet products which were furnished by Union Carbide to be given to the customers.

36. Union Carbide's officials (particularly Messrs. Thomas Roper and Edward Thompson) periodically visited the Island and visited the different customers of Kemet products in Puerto Rico.

The issue before this Court is whether Sudouest was a "dealer" within the ambit of the Act and whether it has a recourse under the Act for the termination of the Sales Representative Agreement executed between the parties herein. We hold that it was not a dealer and therefore it has no recourse under the Act.

In the case of *San Juan Mercantile Corp. v. Canadian Transport Company, Ltd.,* 108 D.P.R. 211–216 (1978), the Supreme Court of Puerto Rico defined the meaning of "dealer" under the Act as follows:

> The dealer figure is principally identified by his efforts to develop a favorable market and the obtention of a clientele for a product or service through promotion and execution of sales contracts. Its function generally involves the activities necessary for the transfer of products or services from the manufacturer to the customer, or to an intermediate point between them. Cf. *J. Soler Motors Corp. v. Kaiser Jeep International Corp., supra.* [108 D.P.R. 134 (1978)] The publicity, market coordination, deliveries of product, collections, keeping of an inventory and principally the promotion and execution of sales contracts are in general terms the obligations of the dealer . . . . .
>
> It is precisely the creation of a market and the establishing of a clientele what constitutes the legal ground for compensating the dealer for the arbitrary termination of the contract. . . . (Translation provided)

"Dealer" is defined in the Act as a "person actually interested in a dealer's contract because *of his having effectively in his charge* in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." (emphasis ours)

A person or corporation, like in the case of Sudouest, who only fills in purchase orders, without determining the type of prod-

ucts to be purchased or their prices; who does not approve the orders, nor has the authority to do so; who does not close sales contracts, nor had the authority to do it; to whom the possible customers are already identified after the promotion of the product and the negotiation of the purchase terms have already been done, cannot be considered as a person having effectively in his charge the distribution and promotion of a merchandise. None of the activities in which Sudouest engaged itself as Union Carbide's sales representative were the functions attributable to a "dealer" protected by the Act. The functions which identify a "dealer" within the ambit of the Act are those of the creation of a market and the obtention of a clientele through the promotion and execution of sales contracts, and Sudouest did not execute sales contracts nor promoted them, nor created a market thereunder. Furthermore, the activities involved with these functions of dealer are those of delivery or products, collection efforts, keeping of an inventory, publicity, market coordination, and promotion and execution of sales contracts. See *San Juan Mercantile, supra.* Sudouest's engagement or involvement with these activities was very limited, not to say non-existent.

We have dealt in other cases with similar sets of facts, and the conclusion has always been that the person has to be effectively in charge of the distribution of the merchandise in Puerto Rico to be entitled to the protection of the Act. See *Cruz Ramos v. Brother International Corp.,* 445 F.Supp. 983 (1978), *aff'd,* 558 F.2d 817 (1st Cir., 1978); and the unreported decision of the Superior Court of Puerto Rico cases *Frank Munarriz v. Capt. Sylvain Ledee, Inc.,* Civ. 67–5799 (September 14, 1977); *Frank Colón, et al v. Ideal Security Hardware Corp.,* decided on September 29, 1981.

Since plaintiff is not a "dealer" protected by the Act, and there being no genuine issue as to any material fact, being defendant entitled to judgment as a matter of law, the Request for Summary Judgment is GRANTED, and the case is hereby DISMISSED.

IT IS SO ORDERED.